## Case No. 11,242.

### The POLAND.

[2 Mich. Lawy. 16.]

District Court, E. D. Michigan. 1877.

WITNESS — PARTIES IN INTEREST — ADMIRALTY — DEATH OF PARTY.

1. When, after the filing of a libel against a vessel and giving the stipulation to answer judg-

ment, the claimant and owner of the vessel dies, and the answer is put in by the administrator of his estate, the same rule with regard to the exclusion of parties in interest as witnesses (section 858, Rev. St. U. S.) applies as if the case were an ordinary common-law action brought against the administrator.

2. In such a case the surviving party is not entitled, as a matter of right, to testify as to transactions with the intestate; but, when the court can see that justice demands that he should be sworn, it is within its discretion to permit his testimony to be given.

On petition of libelants to permit themselves to be sworn as witnesses in their own behalf.

This was a libel for services rendered in towing the barge Poland from Port Huron to East Saginaw. After the filing of the libel, and giving the stipulation to answer judgment, the claimant and owner of the vessel died, and the answer was put in by the administrator of his estate. Upon the hearing, libelants offered themselves as witnesses to certain transactions between them and the deceased. It was claimed, however, in defense, and the court so held, that the case fell within the proviso of section 858 of the Revised Statutes, and that they could not testify as to any transactions with or statements by the deceased claimant. The trial was then stopped, and the case ordered reheard at the next term of court. Libelants then petitioned the court for leave to testify at the rehearing, claiming that the matter was within the discretion of the court.

George E. Halladay, for libelants.
F. H. Canfield, for claimants.

BROWN, District Judge. It was insisted at the hearing that as the action was not originally brought against the administrator, but was a proceeding in rem, the case did not fall within the proviso of section 858, and that the libelants were entitled to be sworn as to transactions with the intestate as a matter of right. I am satisfied, however, with the ruling made at the hearing upon this point. It was held in the case of U. S. v. Ten Thousand Cigars [Case No. 16,451] that a proceeding in rem to obtain a forfeiture of property for violation of the internal revenue law was a "civil action," within the meaning of the section above quoted. Libelants would undoubtedly have been entitled to be sworn had it not been for the proviso, although the action was not originally commenced against the administrator of the owner; still, it has been held that, after the giving of a stipulation to answer judgment in a suit in rem, the action becomes a personal one, as between the libelants and the claimant, and I think the same rule with regard to the exclusion of parties in interest as witnesses applies as if the case were an ordinary common-law action brought against the administrator.

The proviso, however, itself makes an ex-

ception in favor of parties "called to testify to transactions with the deceased by the opposite party, or required to testify thereto by the court." Libelants now petition for leave to be sworn under the last clause of this proviso. It is claimed by the defense, however, that this clause applies only to those cases where the opposite party is entitled to call his antagonist and cross-examine him as upon a bill of discovery; that is, although the party cannot make himself his own witness, he may be made a witness by the opposite party, though not for himself, as if he were a witness in his own behalf. Then analogies of chancery practice are suggested where it is understood a similar practice prevails. Benson v. Leroy, 1 Paige, 122; 3 Daniell, Ch. Prac. 884–885, notes.

Perhaps the use of the word "required," instead of permitted, gives some support to this theory; but I think this could not have been the intention of the legislature, as no such clause would have been necessary to produce this effect. The practice in admiralty is analogous to that in chancery, and whatever the rules of chancery practice would permit would also be permitted in admiralty without legislation. Both systems of practice are derived from the civil law, and the methods of procedure, after the institution of the suit, are similar, except where the peculiar exigencies of the admiralty suggest a different course. I think it was the intention of the legislature, by the clause in question, to permit the court, in cases falling within the proviso, to exercise its discretion in receiving the testimony of the party as a witness. Where the case turns upon a transaction between one party and another deceased, and the circumstances are such as to induce the court to believe that the transaction would be denied by the deceased party if he were alive, and there are no extraneous circumstances throwing light upon the subject, then the testimony of the surviving party should be excluded; but where the court can see that the transaction, as stated by the surviving party, is probable, and there are corroborating circumstances tending strongly to support his version,—in short, when it can see that justice demands that the surviving party should be sworn,— the discretion of the court should be exercised to permit his testimony to be given.

Apply this view of the law to the present case. While the barge was lying at Port Huron, a contract was made between the masters of the tug and barge, by which she was to be towed with other barges to Bay City for one hundred dollars. Shortly before reaching Pointe Aux Barques, the tow was overtaken by a heavy storm, the line connecting the Poland with the barge next in front of her gave way, and she was left adrift. After the tow was broken up, the tug went back to Port Huron, and in a day or two thereafter went in search of the barges, found the Poland at anchor about twenty-

five miles from Port Huron, towed her back to Port Huron, and the next day took her and another barge, and started again for Bay City. On reaching Saginaw Bay, another storm arose, the Poland's line again parted, and left her adrift. The tug then went into Bay City for more coal, and came out the next day to look after the barges. Just outside of Bay City, Mr. Clark, the original claimant and owner of the Poland, got on to the propeller from the tug, went up to Port Hope, where they learned that the barge Poland had gotten back to Port Huron, and the conversation sought to be given in evidence was then had. It is claimed by the libelant Graves, with whom the conversation was had, that, the wind being then ahead, he told the owner of the Poland that he would rather give him what he had done than go down after her to Port Huron; but Clark said he felt as if he ought to pay his tow bill; that he told the owner it would not pay him to go to Port Huron, and tow her up there for such a bill. The owner replied, he felt as if he ought to pay his tow bill, "after I had done what I had to get her there," and if he would go to Port Huron after his barge, and tow her to Bay City, and not tow anything else, he would give him another hundred dollars, which would make the bill two hundred instead of one hundred dollars. Another witness, not a party to the suit, testified that there was a conversation between these parties, and that the owner of the Poland told him "there was an extra." "They were to pay extra, but he did not understand what amount." As matter of fact, the tug did go to Port Huron, took the barge in tow, and towed her to Bay City alone, and delivered her there in safety. He also testifies that there was considerable reluctance on the part of the owner of the tug in undertaking to tow the Poland again. After the barge arrived at Bay City, a bill for two hundred dollars was made out; and it is also claimed by another party, libelant, that $102.50 was paid upon this bill, and that there now remains a balance of $97.50 due him. Libelants now request to be sworn as to conversation with the owner of the barge at Port Hope, and to the payment of $102.50. In determining this question, I consider myself at liberty to look, not only at the petition itself, but at all the testimony which was given at a former hearing, including the testimony of the parties themselves, which was ultimately ruled out. It is manifest that the service performed by the tug was a very arduous and meritorious one. In endeavoring to carry out his first contract, the tow was overtaken by two storms. The Poland's line parted twice, without any fault of the tug, and she was left adrift upon the lake. To have ventured, with other barges, to turn around and attempt to pick up a barge under such circumstances, would have been extremely hazardous, not only for the tug, but for the other barges, and I think that no prudent tug-master would have ventured to do this in his encumbered condition. In the case of The Clematis [Case No. 2,876] it was held by this court that the duty of turning back and endeavoring to pick up a tow of barges under those circumstances was a matter which rested to a great extent in the judgment and discretion of the master, and that a court would not interfere with or reverse that judgment if fairly exercised, although the burden of proof was upon the tug to show that his action was justified by the exigencies of the case. I question seriously whether the intervening circumstances were not such as to justify the master of the tug in treating his original contract as abandoned, and whether, if he had then succeeded in picking up the barge after the line was broken, he would not have been entitled to compensation in the nature of salvage. This view is supported by several recent English cases. The J. C. Potter, 3 Marit. Law Cas. 506; The Minnehaha, 1 Lush. 348; The Pericles, Brown. & L. 81; The Galatea, Swab. 350; The White Star, L. R. 1 Adm. & Ecc. 70; The Waverley, 1 Marit. Law Cas. (N. S.) 47. The proposed testimony tends to show that the original contract was abandoned by mutual consent; that a new contract was made, by which the tug agreed to go to Port Huron, and tow the barge alone to Bay City for $200.

The circumstances seem to me to indicate as quite probable that such contract was made. Libelants produce a bill for $200, upon which there is an endorsement, in writing, of a payment of $102.50. The claimant admits the payment of $100, but objects to the proof of the payment of a larger amount, on the ground that it was a transaction with the deceased. It seems to me highly improbable that the payment of a greater amount than the contract called for upon the theory of the claimant would have been made if the original contract had been considered still in force. It also seems to me improbable that libelants would admit a larger payment to have been made than was in fact made; and the endorsement upon the draft, though unexplained, seems to support his theory. It is also claimed by libelants that the owner of the barge admitted to them more than once the correctness of the account as rendered.

Under all the circumstances of the case, I am satisfied that justice requires that the libelants should be permitted to testify in their own behalf as to transactions with the deceased, and an order will be entered to that effect.